George N. **BELL**, doing business as George N. Bell Manufacturing Chemists, Petitioner,

v.

James L. **GODDARD**, Commissioner, Food and Drug Administration, Respondent.

No. 15124.

United States Court of Appeals
Seventh Circuit.

Aug. 11, 1966.

Donald C. Beelar, Washington, D.C., Lawrence Gunnels, Chicago, Ill., William M. Osborn, Indianapolis, Ind., for petitioner.

William W. Goodrich, Asst. Gen. Counsel, Alvin L. Gottlieb, Attorney, U. S. Department of Health, Education & Welfare, Washington, D.C., Fred M. Vinson, Asst. Atty. Gen., Criminal Division, Harold S. Shapiro, Chief, Administrative Regulations Section, Department of Justice, Joanne S. Sisk, Attorney, United States Department of Health, Education & Welfare, Washington, D. C., of counsel, for respondent.

Before SCHNACKENBERG, CASTLE, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This is an appeal under 21 U.S.C. § 355(h) from an order of the Deputy Commissioner of the Food and Drug Administration withdrawing approval of a new drug application held by the petitioner George N. Bell, doing business as George N. Bell Manufacturing Chemists, Indianapolis, Indiana.

In July 1957 the petitioner filed a new drug application for "Stilboserts" covering the manufacture and sale of a pellet of his own formula containing diethylstilbestrol [1] and intended for use in producing caponette poultry.[2] The applica-

---

1. Diethylstilbestrol and stilbestrol, sometimes abbreviated "DES", refer to the same compound.

2. A "caponette" is defined by the Department of Agriculture regulations as:

   * * * a young, tender-meated bird (usually under 8 months of age) with a soft, pliable smooth-textured skin, which has been treated with diethylstilbestrol or its equivalent. 7 C.F.R. § 81.131(f) (v) (1960).

   The caponette poultry trade, as of 1959, was estimated at one per cent of the United States poultry production, or 15 million birds. The caponette was a premium quality bird, more tender, more flavorful, and juicier and with a better finish, appearance and fewer pin feathers than ordinary chickens. The use of stilbestrol in the production of caponettes, which began in the mid-1940's, not only resulted in a premium product, but improved the ratio of feed to weight gain and largely displaced the more difficult and expensive capon (surgically unsexed male chicken) trade. The principal use of stilbestrol in the poultry trade was in the production of large, meaty birds for roasting, weighing on the average just under 6 pounds.

tion became conditionally effective on January 11, 1958 and fully effective on March 24, 1959.

On December 10, 1959 the Secretary of Health, Education, and Welfare announced that a recently completed re-examination of the use of stilbestrol in the poultry industry had led him to the conclusion that it was desirable to eliminate a potential cancer hazard to the consuming public occasioned by the ingestion of stilbestrol-treated poultry.[3] Shortly thereafter, this administrative proceeding was initiated by the Commissioner of Food and Drugs pursuant to 21 U.S.C. § 355 (e) to determine whether new drug applications covering drugs containing DES for use in poultry production should be suspended. Notices of hearing were issued to the petitioner, to Mattox & Moore, Inc., Indianapolis, Indiana, and to Vineland Poultry Laboratories, Vineland, New Jersey. Consolidated hearings were held.[4]

The hearing examiner found that all products involved were "unsafe" within the meaning of 21 U.S.C. § 355(e) except for the products "No Brood," covered by a new drug application held by Mattox & Moore, and "Anti-Brood," covered by a new drug application held by Vineland, and recommended suspension of all the new drug applications except those covering the latter products. Exceptions to the examiner's tentative order were considered by the Commissioner. He issued a final order with findings of fact and conclusions of law suspending all the new drug applications involved, including the drugs exempted by the hearing ex-

aminer.[5] Thereafter the petitioner instituted this appeal.[6] A summary of the pertinent findings of the Commissioner follows.

The drug involved, Stilboserts, consists of pellets containing either 12 or 15 milligrams of diethylstilbestrol. The pellets, to be implanted in live poultry, are designed to provide for the gradual release of DES over a period of weeks. The labeling submitted with the new drug application recommends the implantation of one tablet in chickens of any age four to six weeks before marketing, and two tablets in turkeys six weeks before marketing. Implantation is "under the loose skin just below the head." Stilboserts were recommended for poultry fattening and to produce tenderized, flavorized, upgraded poultry, and to improve feed efficiency.

DES is a synthetic estrogenic drug which was first used in medical practice in 1939; the use of natural estrogens in medicine dates to about 1920. The first new drug application for the use of DES in medicine was approved in 1941; a new drug application for use of DES in poultry production was first approved in 1947. The fact that oral administration of DES had been shown to produce cancer in test animals was known at that time, and DES was suspected of being carcinogenic to humans. It was believed, however, that no significant residue of the drug remained in the edible tissue of treated poultry.

Beginning in 1955, a team of scientists of the Food and Drug Administration

3. The Secretary stated that manufacturers of DES for treating poultry had agreed to suspend sales of their drugs and that arrangements had been made to discontinue sales of treated birds. Sales of such DES products and of treated poultry have not been resumed since that time.

4. The hearings were consolidated for evidentiary purposes. They were conducted in 1960 and the examiner issued tentative findings of fact and an order in March 1961.

5. A final order was initially issued by the Commissioner in December 1961. All

DES products were held to be "unsafe" and the suspension of all the new drug applications was ordered. Thereafter appeals were taken under the then-effective provisions of 21 U.S.C. § 355(h) to district courts in New Jersey and Indiana. The court in New Jersey set aside the Commissioner's final order on procedural grounds and remanded the case to the FDA. The Commissioner subsequently issued the order which is the subject of this appeal. The order is published at 30 Fed.Reg. 2315 (1965).

6. Vineland and Mattox & Moore have not appealed.

headed by Dr. Ernest Umberger developed a bio-assay method for detecting and measuring the estrogenic residue remaining in edible tissues of poultry treated with drugs containing DES. This test was confirmed by a series of chemical experiments conducted in the spring of 1960 by Dr. Daniel Banes. The bio-assays detected the presence of DES activity; the chemical tests were specific for DES. Based upon the data from these tests, Dr. Umberger was able to calculate that the petitioner's product, Stilboserts, in 15 and 12 milligram doses, under the conditions of use in the petitioner's new drug application, results in the following residues of added DES four weeks after chickens are treated:

> 15 milligrams of diethylstilbestrol leaves a residue of 25 to 50 parts per billion, or from 10 to 20 micrograms per pound of liver; 12 milligrams of diethylstilbestrol leaves a residue of 20 to 50 parts per billion, or from 9 to 20 micrograms per pound of liver.

> Added diethylstilbestrol residues are also found in the skin fat and kidneys.

DES is a synthetic organic compound which, when administered to man or animals, has all the biological effects of the naturally-occurring female sex hormones known as estrogens. Except for quantitative differences, the effects of DES or other estrogenic substances, on either humans or animals are identical, however administered.

DES and other estrogens, when administered to test animals in controlled experiments, have been shown to cause cancers of the breast, endometrium, uterine cervix, pituitary, testes, ovaries, adrenals, and kidneys, and leukemia, in mice, rats, rabbits, hamsters and dogs; often more than one of these cancers appear in a particular species or strain. In addition, fibroid tumors have been produced in guinea pigs.

In humans, chronic estrogenic stimulation of the uterus, whether due to excessive ovarian production or abnormalities of the reproductive cycle, results in increased cancer of the endometrium. Such cancer has also been observed to develop in women during or following estrogen therapy. Women in these two categories show a higher incidence of cancer of the endometrium than women who are not subject to such additional endogenous or exogenous estrogens.

There is a histologically remarkable similarity between cancers of the endometrium in humans and animals. The female $C_3H$ strain mouse has a similarly high incidence of cancer of the breast as human females; male $C_3H$ mice rarely develop such cancer. However, administration of DES will cause cancer of the breast in male $C_3H$ mice, pathologically similar to human breast cancer. And, the cancers have been caused in male $C_3H$ mice by exposure to estrogens within the so-called "natural" or physiological range of estrogens excreted by female $C_3H$ mice. Histologically, the cancers of the breast in male and female $C_3H$ mice are similar. Thus, exposure of male mice to estrogens causes them to have the same type of cancers that occur spontaneously in female mice which excrete natural estrogens.

Humans, both male and female, under estrogen therapy have been observed to develop cancer of the breast. Human breast cancers in the female are sustained and grow upon the estrogens normally secreted by the ovaries and adrenals; the adrenals normally secrete from 15–50 micrograms per day. Removal of those organs results in observable clinical improvement of female breast cancer.

On the basis of animal tests and clinical experience, experts have concluded that DES is a carcinogen to man. Prolonged exposure to small amounts of carcinogenic substances has been shown to be more dangerous than single or short term exposure to the same or larger quantities. There is no known threshold or safe level for DES, either as a cause or stimulator of cancer, and there is no known methodology by which such a level can be established.

Based upon these facts, the Commissioner determined that the addition of diethylstilbestrol to poultry, resulting in

residues in the edible portions, was unsafe to the consuming public.

■■■ The statutory authority for the suspension of the petitioner's new drug application, 21 U.S.C. § 355(e), provided [7] that the effectiveness of an application could be suspended if "clinical experience, tests by new methods, or tests by methods not deemed reasonably applicable when such application became effective" showed that the drug was "unsafe" for use under the conditions upon which the application became effective. The petitioner contends that the final approval of his application was improperly suspended because the suspension was not based upon any evidence from tests or clinical experience occurring after the effective date of his application. He points out that the Food and Drug Administration knew about the diethylstilbestrol residue in caponette poultry treated with Stilboserts and the cancer-producing propensities of diethystilbestrol and in fact withheld approval of his application pending further study of the same tests later used as evidence to support the suspension of his application. He argues that since the quantity of stilbestrol residue in caponette tissues was deemed insignificant at that time, the suspension of his application can only be attributed to the change in policy embarked upon by the Secretary of Health, Education, and Welfare which was allegedly prompted by the latter's desire to achieve improper retrospective application of the so-called "Delaney clause" of the Food Additives Amendment Act of 1958. The Delaney clause, 21 U.S.C. § 348(c)(3)(A), provides that no additive "shall be deemed to be safe if it is found to induce cancer when ingested by man or animal," and is generally intended to prohibit the use of any additives which under any conditions induce cancer in any strain of test animal.

We think that section 505(e) did not restrict the grounds for suspension to wholly new tests of a drug arising after the effective date of the application. The words "clinical experience" must be held to include such experience both prior and subsequent to the effectiveness of the petitioner's application. Such evidence, collected and presented to the Commissioner, if persuasive, constituted a permissible ground for suspension. Since the petitioner's application had become effective, the burden of proving Stilboserts "unsafe" at the suspension proceeding was on the FDA. But this burden could not be compounded by excluding relevant data existing when the application was approved. In this case an extensive re-evaluation, which drew together clinical experience in a manner not previously attempted and which perhaps brought its full impact to the attention of the experts for the first time, provided the basis for the Commissioner's findings. An interpretation of the statute prohibiting such a new application of existing information would do violence to the paramount interest in protecting the public from unsafe drugs. The fact that the re-evaluation may have been inspired by a change in administrative policy is irrelevant.

## II.

■■■ The petitioner contends that the residues of DES found in the livers of caponettes which have been treated with Stilboserts are so miniscule as not to pose a health hazard, in other words, that Stilboserts were not shown to be "unsafe" within the meaning of section 355(e).

7. The statute was amended in 1962. As presently constituted it provides for the withdrawal of approval of a new drug application if it is found:
(1) that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved;
(2) that new evidence of clinical experience, not contained in such application or not available * * * until after such application was approved, or tests by new methods, or tests by methods not deemed reasonably applicable when such application was approved, evaluated together with the evidence available * * when the application was approved, shows that such drug is not shown to be safe for use under the conditions of use upon the basis of which the application was approved * * *.

He points to the evidence in the record that the caponette trade represented one per cent of the poultry market, an average of one caponette per year for every third family in the United States. Assuming residues of the order of forty-five parts per billion, as found by the examiner, this means, according to the petitioner, a total of six micrograms per caponette, a per capita exposure on the average of less than one microgram per year. The petitioner indicates that it is a common practice to apply a safety margin of 100 to 1. This would raise the exposure of DES in the diet per person to a maximum of 100 micrograms, which the petitioner says is an inconsequential, nonharmful residue of the drug in the diet. He further maintains that estrogen occurs in many natural foods and that, according to the evidence, the amount of estrogen exposure in the diet from a variety of common foodstuffs is greater than any exposure from caponette residues. The petitioner also points out that estrogen is produced naturally in the human body which has a regulatory mechanism that varies the amount produced, that this internal regulation in turn is affected by estrogen introduced by external sources, and that excess estrogen is detoxified and conjugated in the liver as a natural process, whatever its source, natural or external.

In sum, the petitioner contends that there is no evidence in the record which demonstrates that exposure to caponette residues in any maximum likely quantity would have any harmful physiological effect.

The answer to the petitioner's contentions in great part is that DES is a carcinogen. The record shows that DES is definitely a cause of cancer in animals, at least an inciter of incipient cancer in man, and possibly a cause of cancer in man. The record also shows that it may take many years, as much as the greater part of a lifespan, for a carcinogen to produce a detectable cancer, and that the quantity of DES which is required to cause a cancer is presently unknown. All that is positively known is that there is a definite connection between DES and cancer. Furthermore, it was shown that prolonged exposure to even small amounts of carcinogenic substances is more dangerous than short term exposure to the same or even larger quantities.

The Commissioner's finding that the DES residues in caponettes are unsafe was based on the testimony of a number of prominent physicians. These witnesses, experts in cancer research, testified that based upon clinical experience and to the extent practicable, no quantity of DES, regardless of amount, should be added to the diet. It is true that the petitioner's expert witnesses disagreed, and testified that the small amount of DES found in caponette livers is safe and would not impose a risk. But this conflict in testimony does not mean that the Commissioner's ultimate finding that the petitioner's drug was not safe is without substantial evidentiary support. Erickson v. FTC, 272 F.2d ,318, 321 (7th Cir. 1959), cert. denied, 362 U.S. 940, 80 S.Ct. 805, 4 L.Ed.2d 769 (1960).

Although the actual number or percentage of chickens treated with DES is unknown, it is a known fact that the consumption of caponettes is not evenly spread over the population. Therefore, attempting to assess the safety factor by averaging per capita consumption in order to show the lack of exposure and hazard, as the petitioner suggests, is not justified. Secondly, even though estrogen occurs naturally in certain foodstuffs, such as beef liver, eggs, and lettuce, there is as yet no knowledge of the amounts which are contained in such foods. The existence of natural estrogen in foodstuffs does not warrant the intake of DES by a deliberate means of exposure through the implantation of such drug in a chicken so as to make it tastier and to save feed costs. If estrogens are contained naturally in certain items of diet, there is no justification for adding more by an artificial method. Finally, the petitioner's contention that the DES residues found in caponettes create no hazard because the estrogen is detoxified and conjugated in the liver of the person who ingests them finds little support in the record.

We hold that there is substantial evidentiary support for the Commissioner's order suspending the petitioner's new drug application for the product Stilboserts on the ground that the use of diethylstilbestrol according to the directions for use upon which the application became effective is unsafe within the meaning of section 505(e).

### III.

Prior to the hearing before the examiner the petitioner moved to dismiss the proceeding for lack of jurisdiction. The Commissioner denied the motion. The petitioner contends that the regulation of poultry marketing and the determination of the wholesomeness of poultry for food are matters exclusively vested in the Secretary of Agriculture under the Poultry Products Inspection Act of 1957, 21 U.S.C. §§ 451–469.[8] He argues that the Secretary of Agriculture has exclusive jurisdiction over the poultry carcass; that the Secretary's function is to inspect the carcass and determine whether it is safe for human consumption. The product within the jurisdiction of the Food and Drug Administration, so the petitioner argues, is the drug, and the function of the agency is limited to determining the safety of the drug as applied to poultry, that is, when used in the practice of veterinary medicine.

The petitioner is mistaken in his contention. The Federal Food, Drug, and Cosmetic Act and the Poultry Products Inspection Act are complementary. This is made clear by the language of both acts as well as by the legislative history of the Poultry Products Inspection Act. The latter statute provides that poultry products shall be exempt from the Federal Food, Drug, and Cosmetic Act only "to the extent of the application" and scope of the Poultry Products Inspection Act. The Poultry Products Inspection

Act does not apply to interstate distribution of new drugs or to the use of such drugs in the treatment of poultry before the poultry reaches the inspection stage; the act does not regulate in any manner the handling, shipment, or sale of live poultry. As the Commissioner points out, this proceeding is concerned with poultry only to the extent that it is the carrier or means by which the petitioner's diethylstilbestrol drug product enters the consumer's diet.

The Commissioner's final order is affirmed.

---

8. 21 U.S.C. §.467(a) provides:
   For the purpose of preventing and eliminating burdens on commerce in poultry and poultry products, the jurisdiction of the Secretary within the scope of this chapter shall be exclusive and poultry and poultry products shall be exempt from the provisions of the Federal Food, Drug, and Cosmetic Act, as amended, to the extent of the application or the extension thereto of the provisions of this chapter.