**MISSISSIPPI POULTRY ASSOCIATION, INC., et al., Plaintiffs–Appellees,**

v.

**Edward R. MADIGAN, Secretary of the United States Department of Agriculture, et al., Defendants–Appellants.**

No. 92–7420.

United States Court of Appeals, Fifth Circuit.

May 28, 1993.

Michael Jay Singer, Asst. Director, Mark W. Pennak and Barbara C. Biddle, U.S. Dept. of Justice Civ. Div. Appellate Staff, Washington, DC, for defendants-appellants.

Hubbard T. Saunders, IV, William J. Cole, III, Crosthwait, Terney, Noble & Allain, Jackson, MS, William A. Bradford, Jr., Gary Jay Kushner, Hogan & Hartson, Washington, DC, for plaintiffs-appellees.

Before REAVLEY, KING, and WIENER, Circuit Judges.

WIENER, Circuit Judge.

This is an appeal from the district court's grant of summary judgment rejecting the Secretary of Agriculture's interpretation of a critical inspection standard contained in the Poultry Products Inspection Act (PPIA).[1] Like Pertelote, we heed Chanticleer's[2] clarion call to resolve the central issue of this most recent in a long and illustrious line of gallinaceous litigation:[3] whether the inter-

---

1. 21 U.S.C. §§ 451–470.

2. GEOFFREY CHAUCER, CANTERBURY TALES 139 (R.M. Lumianski: trans., Simon & Schuster 1954) (*The Nun's Priest's Tale*).

3. *See, e.g., A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (involving indictment for violations of Live poultry Code); *Skinner v. Oklahoma,* 316

pretation of poultry importation standards by the Defendant–Appellant Secretary of Agriculture (the Secretary) is entitled to deference under *Chevron USA v. Natural Resources Defense Council.*[4] Finding the language employed by Congress both clear and unambiguous, we conclude not only that we owe no such deference to the Secretary's interpretation, but also that his interpretation is unsupportable under the plain language of the statute.

I

## FACTS AND PROCEEDINGS

■ At issue in this appeal is the interpretation of § 17(d) of the PPIA[5] and the implementing regulation promulgated jointly by the Secretary and the Food Safety and Inspection Services (FSIS) (collectively, "the Agency"). Section 466(d) provides that all imported poultry products

> shall ... be subject to *the same* inspection, sanitary, quality, species verification, and the residue standards applied to products produced in the United States; and ... have been processed in facilities and under conditions that are *the same as* those under which similar products are processed in the United States.[6]

The Agency promulgated a regulation interpreting the foregoing statutory language as requiring that "[t]he foreign inspection system must maintain a program to assure that the requirements referred to in this section, *at least equal to* those applicable to the Federal System in the United States, are being met."[7]

During the required notice and comment period, the FSIS received thirty-one comments on the proposed rule, more than 75% of which opposed the "at least equal to" language. Nonetheless, in the preamble to the final rule, the FSIS stated that it did not believe that a literal application of the term "the same as" was the intent of Congress, although the FSIS acknowledged that "there are certain features that any system must have to be considered 'the same as' the American system."[8]

Congress reacted to the effrontery of the "at least equal to" language in the regulation by enacting § 2507 of the Food, Agriculture, Conservation, and Trade Act of 1990 (1990 Farm Bill).[9] In that section, Congress addressed the Agency's interpretation, stating that "the regulation promulgated by the Secretary of Agriculture, through the [FSIS], with respect to poultry products offered for importation into the United States does not reflect the intention of the Congress."[10] It

U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (striking down state statute requiring sterilization for habitual criminals and noting that under the law a thrice convicted chicken thief would be subject to sterilization); *Julius Goldman's Egg City v. United States,* 697 F.2d 1051 (Fed.Cir. 1983) (involving the world's largest egg rancher who had sued U.S. government seeking additional compensation for destruction of his flock to control communicable disease); *Coleman v. Sanderson Farms, Inc.,* 629 F.2d 1077 (5th Cir. 1980) (holding that "Load operators" and "live haul drivers" employed by poultry business were "employees employed in agriculture" under the Fair Labor Standards Act); *In re Chicken Antitrust Litigation,* 407 F.Supp. 1285 (N.D.Ga.1975) (addressing motions to compel answers to interrogatories and to dismiss for lack of jurisdiction in chicken anti-trust suit); *United States v. Pete Brown Enterprises, Inc.,* 328 F.Supp. 600 (N.D.Miss.1971) (A purchaser of a flock of chickens as to which government had a perfected security interest did not qualify as a "buyer in the ordinary course of business."); *Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp.,* 190 F.Supp. 116 (S.D.N.Y.1960) (deciding "What is a chicken?"). For additional citations, see Aside,

*Don't Cry Over Filled Milk: The Neglected Footnote Three to Carolene Products,* 136 U.Pa.L.Rev. 1553, 1564 n. 58. For cases involving the PPIA, see *American Federation of Government Employees v. Block,* 655 F.2d 1153 (D.C.Cir.1981); *Armour & Co. v. Ball,* 468 F.2d 76 (6th Cir.1972); *Borden Co. v. Freeman,* 369 F.2d 404 (3d Cir. 1966); *Bell v. Goddard,* 366 F.2d 177 (7th Cir. 1966); *Pacific Meat Co. v. Otagaki,* 47 Haw. 652, 394 P.2d 618 (1964).

4. 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

5. 21 U.S.C. § 466(d).

6. 21 U.S.C. § 466(d) (emphasis added).

7. 52 Fed.Reg. 15963 (May 1, 1987) (emphasis added).

8. 54 Fed.Reg. 43591 (Oct. 30, 1989).

9. Pub.L. No. 101–624, 104 Stat. 3359 (1990).

10. *Id.* In its entirety, § 2507 of the 1990 Farm Bill reads:

then "urge[s]" the Secretary, through the FSIS, to amend the regulation to reflect the true legislative intent.[11] Further, in the House Conference Report accompanying the 1990 Farm Bill, Congress declares that although certain technical deviations from United States standards, such as dye color and materials used for knives, may be acceptable, the "fundamental inspection system, intensity, procedures, and food safety standards, ... should be *the same as* those prevalent in the United States for any such country to be certified for export to the United States." [12] The Agency resisted Congress' expressed wishes, however, and the regulation remained unchanged.

Recognizing the impasse between the Legislative and Executive branches, the Mississippi Poultry Association, Inc. and the National Broiler Council (the Associations), both non-profit trade associations whose members are domestic poultry producers and processors, involved the third branch of government when they filed suit in the Southern District of Mississippi. There the Associations sought a judicial declaration that the 1989 regulation implementing § 466(d) was arbitrary and capricious as contemplated by the Administrative Procedure Act.[13]

The Associations and the Agency filed cross motions for summary judgment. The district court granted the motion in favor of the Associations, 790 F.Supp. 1283, concluding that the regulation's requirement that foreign poultry products be subject to procedures "at least equal" to United States procedures violated the plain language of the statute, which required that procedures for foreign poultry products be "the same as" requirements imposed on domestic poultry. Finding that the "the same as" language was unambiguous, the court declined to give deference to the Agency's interpretation of the statute. In addition to the statutory language, the court stressed that the subsequent statement of Congress in the 1990 Farm Bill was an unequivocal rejection of the Agency's interpretation of § 466(d). The Agency timely appealed.

## II

## ANALYSIS

### A. *Standard of Review*

Our readership should now know by memory that we review the grant of a summary judgment motion "under the same standards which guided the district court." [14] The standards provide that summary judgment is appropriate when no issue of material fact exists and the movant is entitled to judgment as a matter of law.[15] In determining whether the grant was proper, we view all fact

---

(a) FINDINGS.—Congress finds that—
(1) in 1985 the [PPIA], an Act to maintain the integrity and wholesomeness of this Nation's food supply, was amended by the Food Security Act of 1985;
(2) the 1985 amendment provided that poultry products offered for importation into the United States shall be subject to the same inspection, sanitary, quality, species verification, and residue standards applied to products produced in the United States and that such products shall have been processed in facilities and under conditions that are the same as those under which similar products are processed in the United States; and
(3) on October 30, 1989, the Secretary of Agriculture, through the [FSIS], ... promulgated a regulation implementing the 1985 amendment to that Act providing that a foreign inspection system seeking certification for export of poultry to the United States merely impose requirements at least equal to those applicable in the United States.
(b) SENSE OF CONGRESS.—It is the sense of the Congress that—

(1) the regulation promulgated by the Secretary of Agriculture, through the [FSIS], with respect to poultry products offered for importation into the United States does not reflect the intention of the Congress; and
(2) to urge the Secretary, through the [FSIS], to repeal the October 30, 1989 regulation and promulgate a new regulation reflecting the intention of the Congress.
*Id.*

11. *Id.*

12. H.R.Conf.Rep. 916, 101st Cong., 2d Sess., 1222 (1990), *reprinted in* 1990 U.S.C.C.A.N. 4656, 5747 (emphasis added).

13. 5 U.S.C. §§ 500–706.

14. *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988).

15. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

questions in the light most favorable to the nonmovant; questions of law are reviewed de novo.[16]

## B. Chevron *Analysis*

In *Chevron,* the Supreme Court established a two-step method for judicial review of an agency's interpretation of a statute that it administers.[17] The threshold inquiry in a *Chevron* analysis is whether Congress clearly expressed its intent in the plain language of the statute. "If the intent of Congress is clear, that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[18] The first step in determining the intent of Congress is to examine the language of the statute.[19] For, if the language is unambiguous on its face, "then the first canon is also the last: 'judicial inquiry is complete.'"[20] In deciding whether the intent of Congress is clear, courts are to employ the traditional rules of statutory construction.[21]

If, but only if, the language of the statute is determined to be either ambiguous or silent on the particular issue, the reviewing court is to proceed to the second *Chevron* inquiry: "whether the agency's answer is based on a permissible construction of the statute."[22] As long as the agency's interpretation is reasonable, the court should defer to that interpretation and not impose its own construction on the statute.[23]

### Congressional Intent

The Associations insist that the language of the statute is clear in the context of the PPIA: Congress intended that foreign poultry products be subject to inspection standards identical to those imposed on like domestic products. In support of the portion of its argument which urges that the context of the statute controls, the Associations cite the rule that "specific words within a statute may not be read in isolation from the remainder of the entire statutory scheme."[24] "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all their aggregate take their purport from the setting in which they are used...."[25]

To illustrate this latter point, the Associations refer to other sections of the PPIA, in which the words "the same" mean "identical."[26] As the Associations note, another established canon of construction provides that a word used in different parts of the statute should be construed to have the identical meaning throughout the entire statute. When only one meaning of a word can be used consistently throughout the statute, that meaning is plain and unambiguous.[27]

In complementary fashion, the Associations refer us to other sections of the PPIA in which the words "at least equal to" are used. For example, other sections of the PPIA require that the inspection programs of the several states be "at least equal to" the

---

**16.** *Walker,* 853 F.2d at 358.

**17.** *See generally,* Timothy B. Dyk & David Schenck, *Exceptions to Chevron,* ADMIN L.NEWS, Winter 1993 at 1.

**18.** *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781.

**19.** *Connecticut Nat. Bank. v. Germain,* —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992).

**20.** *Id.* at ——, 112 S.Ct. at 1149.

**21.** *See, e.g., EEOC v. Arabian American Oil Co.,* —— U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).

**22.** *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781.

**23.** *Id.*

**24.** *In re Thalheim,* 853 F.2d 383, 387 (5th Cir. 1988).

**25.** *King v. St. Vincent's Hosp.,* —— U.S. ——, ——, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941)).

**26.** For example, § 4(y) of the PPIA provides that "the terms 'pesticide chemical,' 'food additive,' 'color additive,' and 'raw agricultural commodity' shall have *the same* meanings for purposes of this Act as under the Federal Food, Drug, and Cosmetic Act." *Id.* (emphasis added). Clearly, "the same" in this section means "identical."

**27.** *See Ardestani v. INS,* —— U.S. ——, ——, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991).

federal program.[28] As the Associations note, "[t]he use of different words or terms within a statute indicates that Congress intended to establish a different meaning for those words."[29]

On the other hand, the Agency argues that the language of the statute is ambiguous and thus, under *Chevron*, it need only show that its interpretation of the ambiguous statutory language is reasonable. In support of its contention, the Agency relies on *secondary* dictionary definitions of the adjective "same." Conceding that the *primary* meaning of the adjective is "resembling in every way," the government notes that other, secondary definitions include "closely similar" and "comparable," with synonyms of "equivalent" and "tantamount."[30] At oral argument, counsel for the Agency proclaimed that if Congress had used the word "identical" instead of the term "the same as," "I don't think we'd be here today." We fail to see the distinction: Even these secondary meanings are synonymous with "the same as" but not with "at least equal to."

Although we acknowledge that "[t]he existence of alternative dictionary definitions of the word ... each making some sense under the statute, itself indicates that the statute is open to interpretation,"[31] this rule does not advance the Agency's position in the instant case. As the Associations have demonstrated using well established canons of statutory construction, "at least equal to" as a substitute for "the same as" does not make sense under this statute. In any event, we find the Agency's argument disingenuous. Just as there are no degrees of uniqueness, there are no degrees of identity; any fair reading of the dictionary definition of "the same" overwhelmingly demonstrates that "the same" is congruent with "identical."[32] And the Agency's protestations about permissible deviations from an absolute requirement of identity are shown to be unfounded; such de minimis variances are encompassed by the Committee Report's authorized exceptions for "technical deviations."

■ If the Secretary ever harbored nonfrivolous quibbles as to Congress' intent in choosing the term "the same as," they were absolutely eliminated by the subsequent congressional declaration in the 1990 Farm Bill. In that Act, Congress stated emphatically and unequivocally that the Agency has misinterpreted the "same as" standard. The Agency's efforts to make much of Congress' failure actually to amend the statute is a red herring. There simply was no need for Congress to amend the statute; it already stated precisely what Congress wanted it to state. Congress desired the "same as" language, and that is the language it placed in the statute. It is not required to respond to the Agency's disregard of unequivocally expressed congressional intent by amending a

---

**28.** In a 1968 amendment, Congress altered §§ 460(e) and 454(c), using the term "at least equal to" in requiring that states and territories have poultry processes "at least equal to" the federal system. The Secretary rejects the importance of the amendment, emphasizing that §§ 460(e) and 454(c) were not modified in the 1985 amendments, the amendments that added § 466(d). The Secretary insists that it "stretches speculation of Congressional intent past the breaking point to suppose that the word 'same' included in legislation passed in 1985, necessarily means something different than 'at least equal to' in entirely different sections addressing different concerns in legislation passed 17 years earlier." We presume, however, that Congress knows the content of the statute it is amending and therefore, when Congress amended the statute in 1985 adding § 466(d), it presumably knew that the "at least equal to" term was already in the statute. The Secretary also disputes the importance of the 1968 amendment, noting that the legislative history indicates that Congress in 1985

thought the terms "same" was the functional equivalent of the "at least equal to" standard applicable to state inspection programs under §§ 460(c) and 454(c). The Secretary's argument on this point is unavailing, as we do not consider the legislative history of a statute when construing the plain language of a statute; we do so after—but only after—a statute is first found to be ambiguous or silent.

**29.** *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

**30.** WEBSTER'S UNABRIDGED THIRD NEW INTERNATIONAL DICTIONARY 2007 (1986).

**31.** *National R.R. Passenger Corp. v. Boston & Maine Corp.,* ─ U.S. ──, ──, 112 S.Ct. 1394, 1402, 118 L.Ed.2d 52 (1992).

**32.** Interestingly, *Webster's* dictionary defines the word "identical" as meaning "the same." WEBSTER'S, *supra* note 30, at 1122.

statute that is both clear and unambiguous on its face.

■ The Agency also argues that construing "the same as" to mean identical would lead to an absurd result, one which for example would prevent the importation of poultry products processed under *superior systems.* Even if the Agency is correct, however, we cannot agree that the result is absurd. Had the Agency labeled the actions of Congress *protectionism,* we would not necessarily disagree. But, while that may be deemed in some quarters to be unwise or undesirable, it cannot be labeled "absurd" in the context of divining the *result intended by Congress.* The Agency's complaint, therefore, is one implicating the clear policy choice of Congress—a choice made, undoubtedly, in response to effective lobbying by domestic poultry producers. It is not within the purview of the Agency, however—or of the courts for that matter—to alter, frustrate, or subvert congressional policy. Our "third branch" role under the constitutional scheme of separation of powers is limited—as is the role of the Agency—to determining whether that policy is clearly expressed. We conclude that it is in this instance.

In another variation on the absurdity theme, the Agency insists that the interpretation urged by the Associations is absurd because it would place the PPIA in violation of the 1) General Agreement on Tariffs and Trade (GATT),[33] 2) the ongoing trade negotiations under the auspices of GATT (the Uruguay Round of the Multilateral Trade Negotiations),[34] and 3) the United States–Canada Free–Trade Agreement (FTA).[35] The Agency adamantly insists that Congress cannot violate an international obligation without making a clear statement that it intends to

do so. The Agency maintains further that a clear statement is especially appropriate in the instant case because the Executive Branch has exclusive responsibility for conducting international affairs. We discern fatal flaws in the Agency's position.

■ The Agency has obfuscatorily intertwined its arguments, but when they are untangled there appear three separate but related maxims governing the construction of statutes which implicate international obligations. First, Congress may abrogate a treaty or international obligation entered into by the United States only by a clear statement of its intent to do so.[36] Second, the extraterritorial application of domestic laws requires a clear statement of congressional intent so as "to protect against unintended clashes between our laws and those of other nations which could result in international discord."[37] And finally, "[i]t has been a maxim of statutory construction since the decision in *Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804), that 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains.' "[38] Even when we grant arguendo that these truisms of statutory construction exist, we find them inapplicable and therefore not controlling in the instant case.

■ Despite the Agency's claim that Congress must clearly express its intention to violate the GATT, it fails to cite us to any authority for that specific proposition and we are aware of none. In fact, we are aware of strongly instructive authority to the contrary. The Federal Circuit[39] recently rejected out of hand the argument that a statutory provision should be read consistently with

33. 55 U.N.T.S. 187 (Oct. 30, 1947).

34. Trade Negotiations Committee, *Draft Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations,* Part C, ¶ 7 (Dec. 1991).

35. United States–Canada Free–Trade Agreement Implementation Act of 1988, Pub.L. No. 100–449, 102 Stat. 1851 (1988).

36. *Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776, 1782, 80 L.Ed.2d 273 (1984).

37. *Arabian American Oil,* —— U.S. at ——, 111 S.Ct. at 1230.

38. *Weinberger v. Rossi,* 456 U.S. 25, 32, 102 S.Ct. 1510, 1516, 71 L.Ed.2d 715 (1982) (quoting *Murray v. The Charming Betsy,* 2 Cranch at 118).

39. The Federal Circuit has exclusive jurisdiction over appeals from the International Court of Trade.

the obligations of the United States as a signatory of GATT—the very position argued here by the Agency. The court reasoned that

> even if ... [the] Commerce[ ] [Department's] interpretation conflicts with the GATT, ... the GATT is not controlling. While we acknowledge Congress's interest in complying with U.S. responsibilities under the GATT, we are bound not by what we think Congress should or perhaps wanted to do, but by what Congress in fact did. The GATT does not trump domestic legislation; if the statutory provisions at issue here are inconsistent with GATT, it is a matter for Congress and not this court to decide and remedy.[40]

We conclude that this same, flawless reasoning applies to the instant case and mandates that we give effect to Congress' intent, even if implementation of that intent is virtually certain to create a violation of the GATT.

■ Our adoption of this reasoning is unaffected by the maxims of statutory construction cited above. The first maxim—that a clear statement of Congress is required to abrogate a treaty—does not require a different result here because Congress is not *abrogating* a treaty or an international obligation. Abrogation or repeal involves *nullifying* an obligation. In the instant case, Congress has at most evinced an intent to place the PPIA

*in violation of the GATT.* Certainly, the United States has passed laws that, in a subsequent proceeding before a GATT panel, have been declared in violation of the GATT. Yet these violations have not signified the end of American involvement in the GATT.[41]

Second, there is no need here for an *Arabian American Oil Co.* "clear statement" as required when Congress intends for its legislation to violate the GATT. The instant case is distinguishable from the situation in *Arabian American Oil Co.*, which only requires such a clear statement when the intent of Congress is to apply domestic legislation extraterritorially, so as "to protect against unintended clashes between our laws and those of other nations which would result in international discord." [42] Also irrelevant to this case is the Agency's citation of *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District of Iowa,*[43] in which the Court stated that "we have long recognized the demands of comity in suits involving foreign states, either as parties or sovereigns with a coordinate interest in the litigation." [44]

The factual circumstances in both of these cases are distinguishable from those in the instant case. In *Arabian American Oil Co,* the question was whether Title VII applied to American corporations located in Saudi

---

**40.** *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 667–68 (Fed.Cir. 1992) (citations omitted).

**41.** The same reasoning applies to potential violations of the FTA, which has been in effect only since January 1, 1989. Jim C. Chen, *Appointment with Disaster: The Unconstitutionality of Binational Arbitral Review Under the United States–Canada Free Trade Agreement,* 49 Wash. & Lee L.Rev 1455, 1456. Any violation of the Uruguay Round Negotiations is irrelevant, as the negotiations are not in final form and thus cannot be considered binding. *See Public Citizen v. Office of United States Trade Representative,* 970 F.2d 916, 919 (D.C.Cir.1992) (holding that the United States Trade Representative was not required to prepare environmental impact statement for international trade agreements being negotiated). One of the most recent and controversial GATT panel decision holding the United States in violation of the GATT is the Tuna/Dolphin Report, in which the panel concluded that the Marine Mammal Protection Act of 1972, 16 U.S.C. §§ 1361–1407, violated Article XI, prohibiting most quantitative import or export restric-

tions. *General Agreement on Tariffs and Trade: Dispute Settlement Panel Report on United States Restrictions on Imports of Tuna,* 30 I.L.M. 1594 (1991). In addition, we note that the Agency's argument on this point becomes nonsensical when viewed in the context of the GATT or FTA dispute resolution proceedings. If, as the Agency urges, Congress must expressly state its intention to violate the GATT or the FTA, it would, in effect, have admitted its guilt and these proceedings would be unnecessary.

**42.** *Arabian American Oil Co.,* —— U.S. at ——, 111 S.Ct. at 1230. As support for this proposition, the Court cited *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963), in which the Court held that the NLRA did not apply to foreign ships employing foreign seamen.

**43.** 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987).

**44.** *Id.* at 546, 107 S.Ct. at 2557.

Arabia. Obviously, courts must be hesitant to apply American law when it would displace the law of the foreign forum. Similarly, in *Aerospatiale*, the defendants were corporations *owned* by the Republic of France, so for all practical purposes a foreign sovereign was a party in the lawsuit. In both cases the key issue is clear: application of American law would directly *affect the sovereignty of a foreign nation*. That cannot be said of the case now before us. There is absolutely no issue of sovereignty in the instant case; in the absence of such an issue the concerns voiced in *Arabian American Oil Co.* and *Aerospatiale* are not implicated.

■ Like the first two maxims, the third—that an act of Congress should not be construed to violate the law of nations if there is an alternative construction available—cannot apply here. The Agency directs our attention to no supporting authority for its contention that the GATT—or for that matter any multi-lateral trade agreement—falls under the rubric of "the law of nations"; and again we have been unable to find any.[45] Neither have we found a single case in which this canon was applied to international commercial law. Rather, all cases relying on the law-of-nations canon of construction either involve traditional rules of public international law or implicate the sovereignty of a foreign nation.[46] We are loath, therefore, to extend this maxim to multi-lateral trade agreements. To do so in the absence of controlling authority would be to exercise raw judicial fiat.

The additional Agency argument—that a clear congressional statement is especially appropriate in this instance because the Executive Branch has exclusive authority over foreign affairs—borders on frivolity. The Agency overlooks or conveniently ignores the well recognized distinction between foreign *affairs* and foreign *commerce*.[47] Even though the Executive Branch does have exclusive jurisdiction over foreign affairs, the Constitution grants Congress power to regulate commerce with foreign nations.[48] To the extent that a dispute exists over possible foreign policy implications to the GATT, we decline to enter the fray.

■ This final argument exposes the true nature of this case as a dispute between the Executive and Legislative branches over the propriety of Congress' policy choices. Although the Agency makes a compelling argument that the "at least equal to" language is the *better* standard, it simply is not the court's role to judge which branch has proposed the preferable rule. Congress has made clear that "the same as" requires *identical* inspection and processing procedures, and the fact remains that it is Congress that has the right to make the choice, even if it proves to be the wrong choice. As our colleagues of the Federal Circuit have stated: "[W]e are bound not by what we [or the Agency] think Congress should or perhaps wanted to do, but what Congress in fact did."[49] Regardless of whether Congress'

---

**45.** Certainly the Agency cannot contend that the FTA or the Uruguay Round negotiations qualify as "the law of nations." The FTA is a bilateral agreement, involving only the United States and Canada. The Uruguay Round negotiations, on the other hand, cannot bind the United States as there is no final result.

**46.** *Rossi*, 456 U.S. at 25, 102 S.Ct. at 1510 (construing 5 U.S.C. § 7201, which prohibits employment discrimination against United States citizens on military bases overseas unless permitted by "treaty"); *McCulloch*, 372 U.S. at 21–22, 83 S.Ct. at 678 (holding NLRA does not apply to maritime operations of foreign flagship employing alien seaman); *Lauritzen v. Larsen*, 345 U.S. 571, 578, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1953) (holding Jones Act inapplicable to Danish seamen on ship of Danish flag and registry owned by Danish citizen); *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 132, 43 S.Ct. 504, 510, 67 L.Ed.

894 (1923) (Sutherland, J., dissenting) (arguing that 18th Amendment can not apply to foreign ships, as such application would violate international law).

**47.** This misapprehension is illustrated in the cases the Agency cites to support this contention: *Department of Navy v. Egan*, 484 U.S. 518, 529–30, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988) (grant or denial of security clearance to employee); *Haig v. Agee*, 453 U.S. 280, 293–94, 101 S.Ct. 2766, 2775, 69 L.Ed.2d 640 (1981) (revocation of an individual's passport based on determination that individual was threat to national security).

**48.** U.S. CONST. art. I, § 8, cl. 3.

**49.** *Suramerica*, 966 F.2d at 667–68 (Fed.Cir. 1992) (citations omitted).

choice should prove to be unwise or disruptive, that choice itself has been made absolutely.

## III

## CONCLUSION

"But you good people who think that this tale is a piece of foolishness about a . . . hen, take heed of the moral. For St. Paul says that all which is written is written for our instruction. . . ."[50] With this caveat in mind, we carefully consider the instructions written by Congress in the PPIA. After application of the traditional tools of statutory construction, we conclude that the plain language of § 466(d) of the PPIA clearly demonstrates that Congress intended "the same as" to be a synonym for "identical." Any lingering doubt as to Congress' intent is dispelled by its subsequent passage of the 1990 Farm Bill in which it expressly rejected the Agency's unilateral mutation of "the same as" standard to the "at least equal to" language in its regulation.

The Agency's attempts to conjure up ambiguity are unavailing. As we find under the first step of the *Chevron* methodology that the language of the statute is unambiguous, there is neither need nor authority for us to proceed further. We therefore owe no deference to the Agency's interpretation and grant none.

For the foregoing reasons, the district court's summary judgment is

AFFIRMED.

REAVLEY, Circuit Judge, dissenting:

The issue is whether Congress used "same" in 21 U.S.C. § 466(d) to mean "equivalent" or "identical." Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must effectuate Congress' choice if Congress has "directly spoken to [this] precise question." *Id.* at 843, 104 S.Ct. at 2781–82.[1] If Congress did not choose between identicality and equivalence,

we must respect the Secretary's interpretation of section 466(d) if it is "reasonable." *Id.* at 844, 104 S.Ct. at 2782–83.

The majority holds that Congress chose identicality over equivalence when it enacted section 466(d). My analysis of the evidence relied upon by the majority will not allow the conclusion that Congress chose identicality over equivalence. To the contrary, evidence ignored by the majority establishes that Congress has not chosen between identicality and equivalence.

## I. STATUTORY LANGUAGE

The majority professes strict adherence to the words that Congress enacted into law in deciding that Congress precludes the Secretary from reading "same" in section 466(d) to mean "equivalent." Maj. Op. at 1361, 1363. But, in analyzing statutory language, the majority fails to adhere to a similar case recently decided by the Supreme Court.

In *National Ry. Passenger Corp. v. Boston & Maine Corp.,* —— U.S. ——, —— – ——, 112 S.Ct. 1394, 1401–02, 118 L.Ed.2d 52 (1992), the Interstate Commerce Commission (ICC) contended that "required" in 45 U.S.C. § 562(d) means "useful or appropriate," and not "indispensable or necessary" as understood by a railroad company. The Court deferred to ICC under *Chevron;* I quote the *Boston & Me.* Court's analysis *in its entirety:*

> The existence of alternative dictionary definitions of the word "required," each making some sense under the statute, itself indicates that the statute is open to interpretation. Few phrases in a complex scheme of regulation are so clear as to be beyond the need for interpretation when applied in a real context. Further, the structure of the provision reinforces our conclusion that [the statute is ambiguous].

*Id.* at ——, 112 S.Ct. at 1402 (citation omitted); *see also Young v. Community Nutrition Institute,* 476 U.S. 974, 981, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986) (The

---

**50.** CHAUCER, *supra* note 2, at 152.

**1.** *See also id.* (Congressional intent "with respect to the specific issue" must be "clear" and "un-

ambiguously expressed" before courts may ignore "an agency's construction of the statute which it administers.").

court of appeals erred in holding that "shall" must mean "mandatory" and in refusing to defer to an agency's reading of "shall" to confer a modicum of discretion.); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 413, 4 L.Ed. 579 (1819) (Marshall, C.J.) ("Necessary" in the Constitution's Necessary and Proper Clause means "convenient, or useful," not "most direct and simple."). The inadequacy of the majority's statutory-language analysis is seen by comparing it to *Boston & Maine.*

The majority equivocates as to whether "same" can mean "equivalent." *See* Maj. Op. at 1364 ("We fail to see the distinction" between "identical" and "same."); *id.* ("[A]ny fair reading of the dictionary definition of 'the same' overwhelmingly demonstrates that 'the same' is congruent with 'identical.' "). If the majority intimates that "same" cannot mean "equivalent," it disregards authoritative lexigraphic sources in doing so. Webster recognizes both "identical" and "equivalent" as synonyms of "same," and defines "same" as, *inter alia,* "something identical with or similar to another," "closely similar," "comparable," and "not different in relevant essentials." Webster's Third New Inter'l Dictionary 2007 (1986). Black's Law Dictionary explains: "The word 'same' ... does not always mean 'identical.' It frequently means of the kind or species, not the specific thing." Black's Law Dictionary 1340 (6th ed. 1992); *see also id.* ("Equivalent" is a synonym of "same."). Alabama's Supreme Court has interpreted "same" in a statute to mean "equivalent." *Sullivan v. Teague,* 424 So.2d 574, 577 (Ala.1982) ("[W]e hold the term 'same class' as used in [an Alabama statute] to encompass the term 'comparable class.' ").

In support of its intimation that "same" must mean "identical," the majority draws a distinction between "primary" and "secondary" dictionary definitions. Maj. Op. at 1364. Where does this distinction come from and what does it mean? The majority does not base this nonsensical distinction on any authority. I cannot imagine that the majority favors interpreting statutes by choosing the first definition that appears in a dictionary. The *Boston & Maine* Court only looked for "alternative" dictionary definitions. —— U.S. at ——, 112 S.Ct. at 1402; *see also Ardestani v. INS,* —— U.S. ——, ——, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991) ("The word 'under' has many dictionary definitions and must draw its meaning from its context.").

The only other support that the majority offers for its intimation that "same" must mean "identical" is that Webster defines "identical" as meaning "the same." Maj. Op. at 1364 n. 32, citing Webster at 1122. This definition of "identical" is not surprising, *see id.* at 2320 (a "synonym" is "a word having the same meaning as another word"), or relevant. We are only presently concerned with what "same" means. Had Congress placed "identical" in section 466(d) instead of "same," this case would not exist. The majority must concede that "same" can mean either "identical" or "equivalent."

The only remaining question under *Boston & Maine* is whether the alternative dictionary definitions "mak[e] sense under the statute." —— U.S. at ——, 112 S.Ct. at 1402. I disagree with what the majority construes the *Boston & Maine* Court to have meant by this phrase. The majority holds that "equivalence" does not "make sense" under section 466(d) because canons of statutory construction establish that an interpretation of "same" to mean "equivalent" would be inconsistent with the structure of the Poultry Products Inspection Act (PPIA).[2] Maj. Op. at 1363–1364. But the *Boston & Maine* Court did not require alternate dictionary definitions to survive a statutory structural analysis before they may "mak[e] some sense under the statute." Two sentences after the Court states its "making some sense" qualification, the Court adds: *"Further,* the *structure* of the provision *reinforces* our conclusion...." *Boston & Maine,* —— U.S. at ——, 112 S.Ct. at 1402 (emphasis added). By choosing "further" and "reinforces," the Court indicates that structural arguments are *completely distinct* from arguments concerning whether an alternative dictionary definition "mak[es] some sense under the statute." In its haste to adhere to the statutory language of section 466(d), the majority

---

2. 21 U.S.C. §§ 451 et seq.

ignores the Court's language in *Boston & Maine.*

Consistent with all of the Court's language in *Boston & Me.*, "mak[e] some sense under the statute" means that alternative dictionary definitions must each have a *rational effect* under the statute to be considered possibilities for agency choice. *Id.* ("[A] reviewing court need not accept an interpretation which is unreasonable."); *accord Chevron,* 467 U.S. at 844, 104 S.Ct. at 2783 (Where Congress has not decided an issue in delegating authority to an agency, courts are to defer to the agency's choice "[i]f this choice represents a reasonable accommodation of conflicting policies . . . ."). Neither the majority nor the district court hold, nor do the plaintiff trade associations even *argue,* that section 466(d) would have an irrational effect if "same" means "equivalent." Under *Boston & Maine,* this rationality should end our analysis of this case.

Still, any refutation of the majority's opinion would be incomplete without addressing the point upon which the majority bases its decision: when "same" in section 466(d) is read within the structure of the entire PPIA, it must mean "identical" and cannot mean "equivalent." Maj. Op. at 1363–1364. I have two responses. Structural arguments support *both* possible definitions of "same" in section 466(d). More importantly, the ones cited by the majority do not prove that Congress chose identicality over equivalence.

A. OTHER APPEARANCES OF "SAME"

The majority cites 21 U.S.C. § 453(y),[3] and argues that because Congress used "same" in section 453 to mean "identical," and sections 453(y) and 466(d) both fall within the PPIA, Congress also meant "same" in section 466(d) to mean "identical." Maj. Op. at 1363–1364. But, even if "same" means "identical" in other sections of the PPIA,[4] this does not mean that Congress chose between identicality and equivalence in section 466(d). A statutory term can have various meanings even within

a single statute. The Supreme Court recently held that "allowed secured claim" in 11 U.S.C. § 506 means something *different* in subsection (d) than it does in subsection (a). *Dewsnup v. Timm,* —— U.S. ——, —— ——, 112 S.Ct. 773, 778–79, 116 L.Ed.2d 903 (1992). The Court did not presume that "allowed secured claim" must mean the exact same thing in subsections of the same statute. Instead, the Court looked to the "practical effect" of the different possible interpretations, pre-Bankruptcy–Code practice, and the absence of any evidence of congressional intent to change pre-Code practice. *Id.* A majority of the *Dewsnup* Court rejected Justice Scalia's articulation of the very argument that the majority here attempts to resuscitate.

Nonetheless, I wish to discuss Justice Scalia's *Dewsnup* dissent because it shows that even if the *Dewsnup* Court had chosen to follow the authority cited by Justice Scalia, that authority does not support the majority's view of this case. Justice Scalia accuses the *Dewsnup* majority of ignoring the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," and lists cases in which the Court developed this rule. *Id.* at —— ——, 112 S.Ct. at 780–81.

The Court first explicitly adopted the identical-language rule from English jurisprudence in *Atlantic Cleaners & Dryers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 608–09, 76 L.Ed. 1204 (1932). But the *Atlantic Cleaners* Court did not stop with the portion cited by Justice Scalia and relied upon by the majority here. It continues,

the presumption [that identical words used in different parts of the same act are intended to have the same meaning] is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were em-

---

3. Section 453(y) provides: " 'pesticide chemical,' 'food additive,' 'color additive,' and 'raw agricultural commodity' shall have the same meanings for purposes of this Act as under the Federal Food, Drug, and Cosmetic Act."

4. The defendants also find "same" in other PPIA provisions: 21 U.S.C. § 454(c)(1) ("same extent"

and "same manner"); 21 U.S.C.A. § 454(c)(2) (West Supp.1993) ("same person"); and 21 U.S.C. § 460(e) ("same extent" and "same manner").

ployed in different parts of the act with different intent. Where the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different, ... the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed.

*Id.; accord Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 85, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934).[5]

The majority's application of the identical-language rule cannot withstand *Atlantic Cleaners* analysis. In section 466(d), Congress used "same" to state *which substantive standards* foreign poultry producers must meet. The majority relies upon "same" in section 453(y), where Congress used "same" as a shorthand way to *define terms.*[6] The "subject matter to which ['same'] refer[s]," *see id.,* in section 466(d) is dissimilar to the subject matter to which "same" refers elsewhere in the PPIA.[7] Even if the identical-language rule espoused by Justice Scalia survives *Dewsnup*, the majority fails to explain how that rule can apply in this case, where no evidence links congressional intent in choosing "same" for sections 453(y), 454(c), and 460(e), with its intent in choosing "same" for section 466(d).

To support its use of the identical-language rule, the majority exclusively relies upon *Ar-*

*destani,* —— U.S. at ——, 112 S.Ct. at 519. Assuming *arguendo* that *Ardestani* remains good law after *Dewsnup, Ardestani* does not control this case. The *Ardestani* Court rejected an undocumented woman's claim that she was entitled to attorney's fees and costs under the Equal Access to Justice Act (EAJA). *Id.* at ——, 112 S.Ct. at 521. EAJA funds are only available to parties who prevail against the government in "adversary adjudications," which 5 U.S.C. § 504(b)(1)(C)(i) defines as adjudications conducted "under section 554" of the Administrative Procedure Act (APA). Immigration proceedings are not governed by the APA, but they are required by the Immigration and Nationality Act (INA) to be determined on the record after opportunity for a hearing. This "record hearing" requirement of the INA is similar to the "record hearing" requirement in APA § 554(a). Ardestani argued that "the phrase 'under section 554' encompasses all adjudications 'as defined in' § 554(a), even if they are not governed by the procedural provisions established *in the remainder* of that section." *Ardestani,* —— U.S. at ——, 112 S.Ct. at 519 (emphasis added). The Court rejected this argument after holding the phrase "under section 554" unambiguous within the context of the EAJA. *Id.*

The majority relies on the *Ardestani* Court's brief allusion to the identical-language rule, which I quote in its entirety:

As one court has observed, the word "under" appears several times in the EAJA

---

5. The *Atlantic Cleaners* Court's full expression of the identical-language rule complements the Court's oft-cited "rule of *in pari materia* ...: a legislative body generally uses a particular word with a consistent meaning *in a given context." Erlenbaugh v. United States*, 409 U.S. 239, 243, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972).

6. In §§ 454(c)(1) and 460(e), Congress uses "same" to indicate *how and when* poultry producers are to comply with certain standards. In § 454(c)(2), "same" refers to *who* must own a restaurant for the operators to escape poultry inspection requirements. By contrast, in section 466(d), "same" refers to *which* standards foreign producers must meet. I also note that neither the majority nor the plaintiffs explain why "same" in §§ 454(c)(1), 454(c)(2), and 460(c) must mean "identical."

7. It is no surprise that "same" refers to many *different* things in the PPIA, because "same" is a common comparative, not a "term-of-art." By contrast, *Dewsnup* and the cases relied upon by Justice Scalia concern whether *uncommon, technical* terms must be given identical meanings throughout a statute. *See Dewsnup,* —— U.S. at ——, 112 S.Ct. at 780 ("allowed secured claim"); *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990) ("child support"); *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860, 106 S.Ct. 1600, 1606–07, 89 L.Ed.2d 855 (1986) ("child support"); *Helvering*, 293 U.S. at 85, 55 S.Ct. at 51 ("obligation"); *Atlantic Cleaners*, 286 U.S. at 431, 52 S.Ct. at 608 ("trade or commerce"); *see also Patterson v. Shumate,* —— U.S. ——, ——–——, 112 S.Ct. 2242, 2246–47, 119 L.Ed.2d 519 (1992) ("applicable nonbankruptcy law"); *Doctors Hospital, Inc. of Plantation v. Bowen*, 811 F.2d 1448, 1452 (11th Cir.1987) ("amount of the payment").

itself, and "[i]n other locations, no creative reading is possible—'under' means 'subject [or pursuant] to' or 'by reason of the authority of.'"

*Id.* (quoting *St. Louis Fuel and Supply Co. v. FERC,* 890 F.2d 446, 450 (D.C.Cir.1989)). In a footnote, the Court lists three appearances of "under" within the EAJA where "under" means "subject to." *Id.* ── U.S. at ──, 112 S.Ct. at 519 n. 2.

The majority relies on this language to hold that "[w]hen only one meaning of a word can be used consistently throughout the statute, that meaning is plain and unambiguous." Maj. Op. at 1363 (exclusively citing *Ardestani* ). But the *Ardestani* Court never states such a broad proposition; nothing in *Ardestani* indicates that the identical-language rule was dispositive of the ambiguity question in that case. In fact, several other factors entered into the Court's decision that "under" in section 504(b)(1)(C)(i) means "subject to," not "as defined by." First, the Court stressed that the "plain and ordinary" meaning of "under" as used in the EAJA is "subject to." *Id.* at ──, 112 S.Ct. at 519. Unlike this case, the alternate definition of "under" urged by Ardestani—"as defined in"—is not readily apparent from any dictionary definition of "under." *See* WEBSTER'S at 2487. Second, Ardestani asked the Court to construe "under section 554" to mean "as defined in section 554(a)," thus ignoring "the procedural provisions established in the remainder of [section 554]." *Ardestani,* ── U.S. at ──, 112 S.Ct. at 519. Thus, as a matter of context—because Congress said "554" and not "554(a)"—the Court could not credit Ardestani's definition of "under." Finally, the Court relied on the rule that sovereign immunity waivers "must be strictly construed in favor of the United States" in holding that "under" means "subject to." *Id.* at ──, 112 S.Ct. at 520. These alternate reasons for the Court's decision, coupled with the absence of any indication of how much the Court relied on its allusion to the identical-language rule, render *Ardestani* incapable of supporting the majority's dispositive use of the identical-language rule.

Even assuming *arguendo* that *Ardestani* rests entirely upon the identical-language rule, *Ardestani* still does not help the majori-

ty. The *Ardestani* Court demonstrates that Congress used "under" for a *consistent purpose* throughout the EAJA: to limit the operation of EAJA rules to EAJA awards. *Id.* at ──, 112 S.Ct. at 519 n. 2. Neither the majority nor the plaintiffs make any attempt under *Atlantic Cleaners* to show that "same" is used in the PPIA with a consistent purpose.

For all of these independent reasons, the majority errs in holding that the identical-language rule is dispositive of *Chevron's* threshold question. The rule has no application in this case, where Congress understandably uses a common word for several different purposes.

### B.  OTHER APPEARANCES OF "EQUAL"

The majority also claims structural support for reading "same" to mean "identical" in the fact that Congress requires states to adopt poultry inspection requirements that are "at least equal to" federal standards. 21 U.S.C. §§ 454(c), 460(e). The majority relies on *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983), in which the Court states: "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* at 23, 104 S.Ct. at 300 (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)). According to the majority, sections 454(c) and 460(e) show that Congress knew how to adopt an equivalence standard for extra-federal inspection schemes, and the fact that Congress used "same" instead of "at least equal to" in section 466(d) shows that Congress intended something other than an equivalence standard. Maj. Op. at 1363–1364.

But differences exist between the international and state poultry regulation schemes. A state's noncompliance with the "at least equal to" standard of sections 454(c) and 460(e) only subjects the state's poultry producers to federal regulations, while a foreign government that fails to meet the "same" standard of section 466(d) completely forfeits the possibility of exporting poultry to the

United States. Thus, the extra-federal standards that the majority would construe together affect governments with different degrees of sovereignty in very different ways.

Even assuming *arguendo* that the majority's reasoning supports its conclusion, the majority's analogous-statute rule cannot be determinative in this case because it supports the opposite conclusion as well. The federal inspection standard for the importation of foreign meat represents a much closer analogy to section 466(d) than state poultry inspection standards. *See* 21 U.S.C.A. § 620(f) (West Supp.1993). Like section 466(d), section 620(f) affects *foreign* governments by *banning* the importation of meat that is not inspected according to the statutory standard. *Id.* The standard that Congress adopted in section 620(f) disposes of the majority's *Russello* argument:

> meat food products of cattle, sheep, swine, goats horses, mules, or other equines, capable of use as human food, offered for importation into the United States shall be subject to *the* inspection, sanitary, quality, species verification, and residue standards applied to products produced in the United States.

*Id.* (emphasis added). Congress requires imported meat to be inspected according to "the" domestic standards, not according to standards that are the "same" or ones that are "at least equal to" domestic standards.[8] Thus, by the majority's own reasoning, section 620(f) shows that Congress knew how to adopt an identicality standard, and Congress failed to do so in section 466(d). If section 620(f) is not dispositive of this case, it at least renders the majority's analogy to state import standards inconclusive.

The majority has overlooked many other important points in its analysis of sections 454(c) and 460(e). Under the majority's view, section 466(d) holds foreign governments to an identicality standard, and sections 454(c) and 460(e) hold state govern-

ments to an equivalence standard. Maj. Op. at 1364–1365 & n. 28. But, if this is true, it raises a whole new problem of interpretation in section 466(d), which requires foreign poultry to "be subject to the same inspection ... standards *applied to products produced* in the United States." *Id.* (emphasis added). If the majority is correct that sections 454(c) and 460(e) compel us to define "same" in section 466(d) as "identical," then I ask: identical to what? Section 466(d) answers: identical to the standards "applied to products produced in the United States," which, by the majority's own reasoning, include *both* federal standards and *equivalent* state standards. Thus, whether "same" means "identical" or "equivalent" under the majority's reasoning, a foreign government complies with section 466(d) by establishing standards that are "at least equal to" federal standards.

The Secretary argues that sections 454(c) and 460(e) are not dispositive of congressional intent in enacting section 466(d) because the former two statutes address different concerns than section 466(d), and a different Congress enacted section 466(d) 17 years after sections 454(c) and 460(e). The majority dismisses this argument without citing any authority by stating: "We presume ... that Congress knows the content of the statute it is amending." Maj. Op. at 1364 n. 28. The majority's disregard of the differences raised by the Secretary contradicts the writing of the Supreme Court and this circuit. *See Erlenbaugh*, 409 U.S. at 243, 93 S.Ct. at 480 (The rule that "a legislative body generally uses a particular word with a consistent meaning in a given context ... certainly makes the most sense when the statutes were enacted by the same legislative body at the same time."); *Mattox v. FTC*, 752 F.2d 116, 122 (5th Cir.1985) (following *Erlenbaugh* in refusing to consider an earlier statute in construing a later one because of the time

---

**8.** Even under the stronger identicality language of section 620(f), the Secretary *still* imposes an equivalence standard on foreign meat-inspection requirements. *See* 9 C.F.R. § 327.2(a)(1) (For an export certificate, foreign governments must enforce meat-inspection "requirements at least

equal to all the inspection, building construction standards, and all other provisions of" federal law.). I am aware of no challenge to this regulation that is similar to the one in this case. Of course, I take no position on the legitimacy of § 327.2(a)(1).

difference in enactment dates and the lack of "necessary identity of purpose").[9]

The Secretary's arguments concerning differences between section 466(d) and sections 454(c) and 460(e) have merit independent of section 620(f) and the practical consequence of the majority's use of sections 454(c) and 460(e). "[R]elated statutes will vary in probative value" according to the "range of awareness" of the statutes among legislators. NORMAN J. SINGER, 2B SUTHERLAND STATUTORY CONSTRUCTION § 51.01, at 117 (5th ed. 1992); *see also id.* at 118 ("The critical question concerns how reasonable it is to assume that legislators ... know the provisions of other acts on the same subject when they consider the meaning of the act to be construed."); *id.* ("[I]t is unrealistic to assume that whenever the legislature passes a statute it has in mind all prior acts relating to the same subject matter."). In the seventeen years that passed between enactment of sections 454(c) and 460(e) in 1968 and enactment of section 466(d) in 1985, Congress changed membership eight times and congressional districts were twice redrawn. Congress, of course, considered many disparate issues in the interim. For these reasons, the seventeen-year difference in this case is not different *in kind* from the 62-year difference that this court considered significant in *Mattox.* 752 F.2d at 122. The import of sections 454(c) and 460(e) in interpreting section 466(d) is further minimized by the fact that, as discussed above, these statutes affect different governments in different ways than does section 466(d). *See Erlenbaugh,* 409 U.S. at 245, 93 S.Ct. at 481 (rejecting *in pari*

*materia* argument because "[t]he two statutes ... play different roles in achieving [a] broad, common goal"). Finally, sections 454(c) and 460(e) are entitled to little weight because they are relatively few (two), and they are not consistent with section 620(f). *Cf. Keifer & Keifer v. Reconstruction Finance Corp.,* 306 U.S. 381, 390, 59 S.Ct. 516, 518–19, 83 L.Ed. 784 (1939) (In recognizing that the Regional Agricultural Credit Corporation was amenable to suit despite the lack of statutory language to support this rule, the Court accorded substantial weight to the fact that Congress had created "not less than *forty* ... corporations" by statute, and "*without exception*" had included the authority to sue-and-be-sued.) (emphasis added).

For these manifold reasons, sections 454(c) and 460(e) do not indicate that Congress chose identicality over equivalence.[10]

### C. PPIA SECTION 451

In describing the statutory structure in which Congress placed "same" in section 466(d), the majority ignores an argument that contravenes its decision. In 21 U.S.C. § 451, Congress bases the entire PPIA on its finding that "[u]nwholesome, adulterated, or misbranded poultry products" hurt people and destroy markets for poultry. In my Part II analysis of the policy implications of section 466(d), I explain that the Secretary's interpretation of "same" to mean "equivalent" results in wholesomeness, absence-of-adulteration, and proper-marking qualities which *meet or better* the results of an identicality standard. *See* Part II.B., *infra.*[11] In

---

**9.** *See also Jones v. St. Louis–San Francisco Ry. Co.,* 728 F.2d 257, 262 (6th Cir.1984) (The rule that "when Congress enacts a new statute, it is aware of all previously enacted statutes pertaining to the same subject" applies with greatest strength when the two statutes at issue were enacted by the same legislative body, at the same time.).

**10.** The majority does not even claim, much less establish with authority, that sections 454(c) and 460(e) are or can be *dispositive* of congressional intent in enacting section 466(d). *Cf. In re Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 650, 98 S.Ct. 2053, 2065 n. 32, 56 L.Ed.2d 591 (1978) ("since § 15(7) is in all respects *in pari materia* with §§ 316(g), 907(g), and 1006(c), the plain meaning of the latter sections should be given significant weight in construing the former").

**11.** Section 451 demonstrates how policy is relevant to the determination of whether section 466(d) is ambiguous. *See* Part II.A., *infra* (Courts may consider policy and legislative history *to determine* whether statutory language is ambiguous.). Unlike the majority, the district court even considered legislative history to be relevant in its determination that section 466(d) is not ambiguous. *See Mississippi Poultry Ass'n v. Madigan,* 790 F.Supp. 1283, 1288–89 (S.D.Miss.1992) (Section 466(d) is not ambiguous because, *inter alia,* the Secretary required foreign poultry to meet an equivalence standard for years before Congress adopted the "same" standard in 1985.). Although I disagree with the conclusions that the district court draws from the legislative history, *see* Part II.B., *infra,* I agree that legislative history helps us ascertain

fact, the *only* result of substituting an identicality standard for the Secretary's equivalence standard is to erect a trade barrier, as the majority recognizes. *See* Maj. Op. at 1365.

While the majority claims to strictly adhere to the principle that words "take their purport from the setting in which they are used," *see id.* Maj. Op. at 1363 (quoting *King v. St. Vincent's Hosp.,* —— U.S. ——, ——, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991)), it ignores the fact that section 466(d) appears in a poultry-inspection act which is expressly based upon Congress' exclusive finding that *unwholesome, adulterated, and misbranded* poultry must be eliminated to protect people and poultry markets. 21 U.S.C. § 451. Where is the majority's explanation of how an identicality standard is consistent with section 451?

My analysis of the extant structural arguments shows that the ones relied upon by the majority are inconclusive, and the section 451 argument indicates that Congress did not choose identicality. Thus, even under the majority's understanding of "make[s] some sense," the Secretary's interpretation of "same" is entitled to deference under *Boston & Maine. See* —— U.S. at ——, 112 S.Ct. at 1402. And although *Boston & Me.* renders analysis of the legislative history and policy of section 466(d) unnecessary, these considerations confirm that Congress did not choose between identicality and equivalence in enacting section 466(d). So I do not stop with statutory text.

## II. LEGISLATIVE HISTORY AND POLICY

The majority's solution to embarrassing arguments that stem from the legislative history and policy behind section 466(d) is to label section 466(d) "unambiguous," and ignore the parts of the legislative history which do not support its conclusion. *Compare* Maj. Op. at 1363–1364 n. 28 (refusing to consider the Secretary's legislative-history argument) *with id.* Maj. Op. at 1364–1365, 1368 (relying

upon legislative history formed after section 466(d) was enacted). So, before presenting the whole legislative history in the context of the policy behind section 466(d), I will substantiate why I reach legislative history and policy.

### A. THE UNAMBIGUOUS-STATUTE BAR

The majority recasts *Chevron's* threshold inquiry as whether "the *language of the statute* is determined to be either ambiguous or silent" on the choice between identicality and equivalence. Maj. Op. at 1363 (emphasis added).[12] By so transforming the inquiry, the majority justifies avoiding the legislative history of section 466(d), *id.* Maj. Op. at 1363–1364 n. 28, and the policy implications of construing section 466(d) to adopt an identicality standard. *Id.* Maj. Op. at 1365. To excuse its exclusion of legislative history and policy, the majority relies on a passage from *Connecticut National Bank v. Germain,* —— U.S. ——, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992): "[w]hen the words of a statute are unambiguous, ... 'judicial inquiry is complete.'" *Id.* at ——, 112 S.Ct. at 1149 (quoting *Rubin v. United States,* 449 U.S. 424, 428, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)); *see* Maj. Op. at 1363.

For three independent reasons, *Germain* does not limit this court's ability to fully consider legislative history and policy in this case. Foremost, as I have demonstrated, "same" does not have a singular meaning even within the structure of the PPIA. *See* Part I, *supra.*

Second, *Germain* and the cases from which it is derived say nothing about whether courts may consider legislative history and policy to answer the threshold question in *Chevron.* These cases only state a canon of construction that presupposes a finding of no ambiguity. *See Germain,* —— U.S. at ——, 112 S.Ct. at 1149; *Toibb v. Radloff,* —— U.S. ——, ——, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991); *United States v. Ron Pair Enters.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Burlington North-*

---

whether Congress chose between identicality and equivalence in enacting section 466(d).

**12.** *See also id.* Maj. Op. at 1361 ("Finding the language employed by Congress both clear and

unambiguous, we conclude ... that we owe no ... deference to the Secretary's interpretation.").

*ern Ry. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987).

In the *Germain* line of cases, parties attempt to use sources other than statutory text to contradict what everyone agrees a statute says. *See Germain,* —— U.S. at —— – ——, 112 S.Ct. at 1149–50 (no need to consider the argument "that legislative history points to a different result" when there was no argument about what statutory text says); *Toibb,* —— U.S. at ——, 111 S.Ct. at 2200 (no need to address argument that legislative history and structure engraft a requirement which proponent acknowledges is absent from statutory text); *Ron Pair,* 489 U.S. at 242–45, 109 S.Ct. at 1031–33 (unnecessary to consider argument that pre-statutory practice should alter meaning of unambiguous statutory text); *Burlington Northern,* 481 U.S. at 462, 107 S.Ct. at 1860–61 (legislative history "irrelevant" after Court finds no legitimate challenge to the text's meaning). By contrast, the Secretary offers evidence of legislative history and policy to show that Congress did not choose between identicality and equivalence in enacting section 466(d).[13] The line of cases that *Germain* exemplifies is inapposite. Neither the majority, nor the district court, nor the plaintiffs cite any authority for the proposition that legislative history and policy are irrelevant to *whether* a statute's text is ambiguous. *Cf. Chevron,* 467 U.S. at 859–65, 104 S.Ct. at 2790–93 (considering whether Congress directly spoke to the precise question at issue under the subheadings "Statutory Language," "Legislative History," and "Policy").

Finally, even if the majority believes that it may not rely on legislative history and policy to decide this case, I question why it has not followed the Supreme Court's custom of treating legislative history and policy arguments even after declaring a statute unambiguous. *See Germain,* —— U.S. at ——, 112 S.Ct. at 1149 (rejecting the policy argument

that Congress would not enact redundant statutes "[b]ecause giving effect to both ... would not render one or the other *wholly superfluous*" before applying the unambiguous-statute rule) (emphasis added); *id.* at ——, 112 S.Ct. at 1150 (Stevens, J., concurring) (rejecting legislative-history argument on the merits that the *Germain* majority refused to consider); *Toibb,* —— U.S. at ——, 111 S.Ct. at 2200–01 (discussing merits of legislative-history and policy arguments after stating that the unambiguous-statute rule applies); *Ron Pair,* 489 U.S. at 245, 109 S.Ct. at 1033 (discussing merits of argument based on pre-statutory practice after stating unambiguous-statute rule). *But see Burlington Northern,* 481 U.S. at 462, 107 S.Ct. at 1860–61 (no legislative-history discussion after statute found unambiguous). Courts of Appeals have been no less reticent in considering the merits of legislative-history and policy arguments even after finding a statute unambiguous. *See, e.g., In re Kelly,* 841 F.2d 908, 912–13 & nn. 3–4 (9th Cir.1988); *Doctors Hospital, Inc. of Plantation v. Bowen,* 811 F.2d 1448, 1453 (11th Cir.1987).

These cases establish that a court risks nothing by discussing the merits of legislative-history and policy arguments even after declaring a statute unambiguous, and that such discussions represent appropriate responses to parties' concerns on appeal. A court can only strengthen its analysis by explaining how its construction is consistent with legislative-history and policy arguments. Thus, the Court has explained: "When aid to construction of the meaning of words, as used in [a] statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976) (quoting *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940)). Even the *Germain* majority characterized "canons of

---

**13.** In *Germain, Toibb, Ron Pair, Burlington Northern,* and similar cases, the parties called on the *Court* to interpret the statute. But in *Chevron* cases, the threshold question is whether a court should defer to an *agency's* interpretation of a statute. The *Chevron* Court listed nine examples of cases where the Court has stated or applied

the rule that the Court will not defer to an agency interpretation which contravenes the clear intent of Congress. 467 U.S. at 843 n. 9, 104 S.Ct. at 2781–82 n. 9. In these nine cases, the Court routinely considered policy and legislative history without ever mentioning an unambiguous-statute rule.

construction," including the unambiguous-statute rule, as "no more than rules of thumb that help courts determine the meaning of legislation." ——— U.S. at ———, 112 S.Ct. at 1149.

A rule that precludes courts from considering legislative history and policy when construing statutes amounts to a quasi-evidentiary limitation. But rather than hold that a lower court has considered improper evidence of statutory meaning, a reviewing court merely decides for itself what a statute means. *See Chevron*, 467 U.S. at 841, 104 S.Ct. at 2781 (*de novo* determination of whether Congress addressed a disputed point in a statute). Given this *de novo* review, evidentiary limitations are pointless. Thus, while the Court has found that a lower court has erred by *refusing* to consider legislative history in discerning a statute's meaning, *Train*, 426 U.S. at 9, 96 S.Ct. at 1942, the Court has not held that a lower court has erred because it considered excessive evidence of statutory meaning.

The majority's decision to ignore considerations of legislative history and policy in this case is indefensible.

### B. AFFIRMATIVE EVIDENCE OF THE ABSENCE OF CHOICE

Legislative history and policy together affirmatively establish that Congress has *not* "directly spoken to the precise question" of whether "same" means "identical" or "equivalent" in section 466(d). *See Chevron*, 467 U.S. at 841, 104 S.Ct. at 2781. The *only* rational policy effect of choosing identicality

over equivalence is that fewer foreign birds will enter the United States under an identicality standard than would enter under an equivalence standard.[14] By definition, the Secretary's equivalence standard results in poultry that is *at least* as safe and correctly-packaged as that produced under federal standards.[15] *See* 54 FED.REG. 43948, 43951 (Oct. 30, 1989) ("The quality of the finished product is what is important and decisive."). If Congress chose between identicality and equivalence in enacting section 466(d) as the majority holds, it must have done so because of the trade implications of an identicality standard. No one suggests another reason.[16] But there is no record anywhere of any congressional consideration of the trade implications of an identicality standard before Congress passed section 466(d). This wholesale lack of attention to the *only* rational policy difference between identicality and equivalence establishes that Congress never chose between identicality and equivalence. *Cf. Dewsnup*, ——— U.S. at ———, 112 S.Ct. at 779 (The "Court has been reluctant to accept arguments that would interpret the [Bankruptcy] Code ... to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.").

The majority evades this critical point with the truism that neither courts nor agencies can alter policy choices made by Congress. *See* Maj. Op. at 1365. This truism does not alter the fact that we sit to determine *whether* Congress has in fact made a policy choice, regardless of the merit of that choice. I

---

**14.** As the majority says, section 466(d) effects "protectionism ... undoubtedly, in response to effective lobbying by domestic poultry producers." Maj. Op. at 1365.

**15.** The plaintiffs concede that identicality would preclude foreign nations from adopting standards that result in *safer* poultry products than those produced under United States standards. Moreover, they do not challenge any application of an equivalence standard; they only argue that the Secretary's equivalence standard in 9 C.F.R. § 381.196(a)(2)(i) is facially inconsistent with Congress' use of "same" in section 466(d).

**16.** There is no record of any dissatisfaction with the safety of foreign poultry under an equivalence standard until *after* Congress passed section 466(d) and the Secretary proposed to retain

its equivalence standard. *See* 54 FED.REG. at 43950 (rejecting post-section 466(d) arguments that an equivalence standard would result in inferior products entering the United States). The record in this case contains no evidence of inferior foreign poultry products entering the United States as a result of an equivalence standard.

The plaintiffs take the following position in this appeal: "The purpose of section [466(d)] was to require importers of foreign poultry products to be subject to the same standards that domestic poultry processors experience." Mississippi Poultry Ass'n Brief at 26. This makes no sense as a statement of purpose; the plaintiffs erroneously conflate means and purpose to avoid admitting that trade is the only policy difference between identicality and equivalence.

would decide this case according to the simple logic that if Congress wanted to erect a trade barrier, someone, somewhere, would have said something about why a barrier was justified, what it was supposed to accomplish, or how its effectiveness would be monitored.

The majority conveniently omits any explanation of how "same" came to appear in section 466(d). From 1972 to 1984, the Secretary certified countries to export poultry products to the United States if they adopted certain standards that were "at least equal to" the standards applicable to establishments operating within the United States. 9 C.F.R. § 381.196(a)(2)(iv) (1984). The Secretary certified Canada, France, Great Britain, Hong Kong, and Israel using its "at least equal to" standard. 54 FED.REG. at 43950. There is no record anywhere of congressional criticism of the existence or application of the equivalence standard before Congress passed section 466(d). In 1985, the Senate Committee on Agriculture, Nutrition, and Forestry included what was to become section 466(d) as part of the 1985 Farm Bill. The Agriculture Committee intended to "strengthen present law regulating the importation of poultry" by requiring poultry-exporting countries to implement programs for testing residues, which was not required of imported poultry before 1985, but had been required of imported meat since 1981. S.REP. No. 99–145, 99th Cong., 1st Sess. 339–40 (1985), reprinted in 3 U.S.C.C.A.N. at 2005–06 (1985); see also 54 FED.REG. at 43950. The Agriculture Committee did not criticize the Secretary's long-established equivalence standard, or adduce any evidence against it. Instead, the Agriculture Committee sent the 1985 Farm Bill to the full Senate with the equivalence standard intact. Id. at 516, reprinted in 3 U.S.C.C.A.N. at 2182 (1985).

While the 1985 Farm Bill was under consideration on the Senate floor, Senator Helms offered an amendment which substituted "the same as" for "at least equal to" in the portion of the 1985 Farm Bill that became section 466(d). Senator Helms explained that his amendment was "purely technical" and intended to "clarif[y] the provision to reflect the original intent of the provision as adopted by the committee in markup." 131 CONG.REC. 33358 (Nov. 22,

1985). Without any debate, further explanation, or recorded vote, the Senate adopted Senator Helms's amendment. A conference committee adopted the Senate's version of what became section 466(d) without any recorded consideration of the effect of Senator Helms's amendment. H.R.CONF.REP. No. 99–447, 99th Cong., 1st Sess. 583–84 (1985), reprinted in 3 U.S.C.C.A.N. at 2509–10 (1985).

Either Senator Helms meant to incorporate an identicality standard in section 466(d) by amending the statute to use "same," or he did not intend to incorporate an identicality standard. He did not affirmatively indicate that he desired an identicality standard or that he wanted to change the substance of the Agriculture Committee's equivalence standard. Nor did he mention the trade consequences of a substantive change. Instead, he said that he wanted the provision to reflect the Agriculture Committee's "original intent," which it expressed in an equivalence standard. See S.REP. No. 99–145 at 516, reprinted in 3 U.S.C.C.A.N. at 2182 (1985). These points indicate that Senator Helms did not subjectively desire an identicality standard.

But even if Senator Helms harbored this subjective intent, are we to attribute it to Congress as an institution when Senator Helms indicated that his amendment was of minimal importance, failed to call Congress' attention to the major trade consequences of such an interpretation of the amendment, and most importantly, used equivocal language to institute an identicality standard? The facts of this case provide no basis on which to hold that Congress "directly spoke[ ] to the precise question" of whether section 466(d) mandates identicality. See Chevron, 467 U.S. at 841, 104 S.Ct. at 2781.

Predictably, the majority turns to section 2507 of the 1990 Farm Bill, where Congress declares that its "sense" is to "urge" the Secretary to substitute "same" for the equivalence standard challenged in this case. Maj. Op. at 1364 (referencing the Food, Agriculture, Conservation, and Trade Act of 1990, PUB.L. No. 101–624 § 2507, 104 Stat. 3359, 4068–69 (1990)). But a careful study of section 2507 and its background teaches that section 2507 better explains why the Secre-

tary clings to an equivalence standard rather than adopting the position that the majority would have him take.

Section 2507 undeniably has the force of federal law. *See* President George Bush, *Statement at the Signing of the 1990 Farm Bill*, 1990 U.S.C.C.A.N. 5762. But by its own terms, this "law" only states a fact that the 101st Congress believes to be true and makes a suggestion to the Secretary. The plaintiffs do not contend that Congress established an identicality standard in section 2507; in their complaint, they only seek a declaratory judgment that 9 C.F.R. § 381.-196 is inconsistent with the *PPIA*, which includes section 466(d) and does not include section 2507.

The plaintiffs contend that the intent of the 101st Congress as expressed in the 1990 Farm Bill is relevant to determine what the intent of the 99th Congress was in drafting the 1985 Farm Bill. The Supreme Court's most recent pronouncement on the value of subsequent legislative history is absolute: "it is the function of the courts and not the Legislature ... to say what an enacted statute means." *Pierce v. Underwood*, 487 U.S. 552, 566, 108 S.Ct. 2541, 2551, 101 L.Ed.2d 490 (1988) (refusing to consider a 1985 House Report that directly contradicts the Court's reading of a 1980 statute). And although the Court has cited subsequent legislative history to support its decisions before *Pierce*, it has only done so in cases where the job of statutory construction has fallen to the Court.[17] I am aware of no case where any court has

held that subsequent legislative history is at all relevant to cases like this one, where, rather than determine what a statute means, we must determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. Even the most unambiguous intent in 1990 cannot establish the intent of a different group of people five years earlier.[18] Section 2507 has no bearing on our present inquiry.

Ironically, Congress' 1990 advice to the Secretary provides insight into why the Secretary's equivalence standard is necessary. The Secretary's equivalence standard permits a modicum of subjectivity in the Secretary's determination of whether foreign standards are the same as United States standards. *See* 54 FED.REG. at 43950. Under an identicality standard as advocated by the plaintiffs here, foreign poultry would be completely banned unless another country is willing to adopt our standards word-for-word. *Id.* Besides the cultural affront and practical difficulties that an identicality standard would entail, of itself it does nothing to ensure safe poultry.[19] Congress recognized *exactly this problem* with identicality when it enacted section 2507:

> The Managers [of section 2507] understand and appreciate that technical requirements might differ in other countries because of custom, practicality, or compelling local needs, and the Secretary should have the flexibility to accept as being in compliance

**17.** *See Bell v. New Jersey*, 461 U.S. 773, 784, 103 S.Ct. 2187, 2194, 76 L.Ed.2d 312 (1983) ("Of course, the view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value."). *But see Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.") (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)); *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 201, 98 S.Ct. 444, 449, 54 L.Ed.2d 402 (1977) ("Legislative observations 10 years after passage of the Act are in no sense part of the legislative history.").

**18.** Neither the plaintiffs nor the majority contend that Congress satisfied *Chevron's* threshold inquiry for the first time in 1990 by enacting section

2507. *See* Maj. Op. at 1364; Mississippi Poultry Ass'n Brief at 40. Such a reading would accord section 2507 an effect which directly contravenes its language. Section 2507 is undeniably precatory. It "urg[es] the Secretary ... to promulgate a new regulation reflecting the intention of the Congress." Congress could have replaced "same" in section 466(d) with "identical" once it realized in 1990 that the Secretary interpreted "same" to mean "equivalent," but it did not. Moreover, I am aware of no case in which a court has permitted Congress to satisfy *Chevron's* threshold inquiry *after* the disputed statute has been enacted.

**19.** At oral argument, the Secretary's counsel explained that under an identicality standard, foreign countries would have to specify building dimensions in feet even though most of our neighbors use the metric system.

with United States requirements those technical deviations that can be justified. For example, the color of dye used for identifying condemned products or the materials used for knives and other slaughter and processing implements would be of little consequence to the ultimate food safety objective, and, if different as between the United States and a country seeking export certification should not interfere with such certification.

H.R.CONF.REP. 916, 101st Cong., 2d Sess. 1222 (1990), *reprinted in* 1990 U.S.C.C.A.N. 4656, 5747. Thus, in section 2507, Congress told the Secretary that his equivalence standard was wrong, but in the legislative history of section 2507, Congress vindicated the Secretary's reason for adopting an equivalence standard. Nowhere in section 2507 or its history does Congress suggest that the Secretary adopt an identicality standard, even though the Secretary publicly explained in 1989 that he understood his choices to be between identicality and equivalence. *See* 54 FED.REG. at 43950. Instead of helping the Secretary interpret "same," Section 2507 and its history simply "urge" the Secretary to adopt a "same" standard, and to ignore technical deviations from this standard. But the Secretary understood his equivalence standard to operate just like a "same" standard that permits various technical deviations. If Congress demands something different, it has yet to say so.

### III. CONCLUSION

Professor Singer aptly describes what the majority has done:

> The assertion in a judicial opinion that a statute needs no interpretation because it is "clear and unambiguous" is in reality evidence that the court has already considered and construed the act. It may also signify that the court is unwilling to consider evidence bearing on the question how the statute should be construed, and is instead declaring its effect on the basis of the judge's own uninstructed and unrationalized impression of its meaning.

NORMAN J. SINGER, 2A SUTHERLAND STATUTORY CONSTRUCTION § 45.02, at 6. The majority cannot pretend to be instructed about whether Congress chose between identicality and

equivalence because it turns a blind eye toward dispositive evidence of whether Congress made this choice. Worse, the majority's loose application of construction rules cannot support its assertion of statutory precision.

The decision of what "same" means should remain with the Secretary until Congress says otherwise, and no one contends that the Secretary's choice has an unreasonable effect. I would reverse the district court's decision and render judgment for the Secretary.

I dissent.